IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-01851-MSK-KMT

MARIAN L. OLSON d/b/a BANNACK PUBLISHING CO.,

      Plaintiff,

v.

THE CITY OF GOLDEN, COLORADO, a Colorado Home Rule Municipal Corporation,

      Defendant.

_____

## ORDER GRANTING JUDGMENT TO DEFENDANT

**THIS MATTER** comes before the Court on a stipulated factual record (**#69**), the parties'

submissions of opening (**#70, 71**) and response briefs (**#72, 73**), Defendant City of Golden's

("Golden") Supplemental Brief (**#82**), Ms. Olson's Response thereto (**#91**) and Errata (**#92**), and

the parties' supplemental authority (**# 74, 78, 79**).  Having considered the same, the Court

**FINDS** and **CONCLUDES** the following.

### I.   Jurisdiction

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.

### II.   Issues Presented

Ms. Olsen asserts both facial and as-applied challenges to the constitutionality of the City

of Golden's campaign finance ordinance.[1]  She argues that the ordinance is facially vague and

_____

[1]  A facial challenge tests a law's application to all conceivable parties, while an as-
applied challenge tests the application in regard to only the specific facts of a plaintiff's case.
*See Colo. Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007).

overbroad and that it unduly burdens freedom of speech and the press.  She also contends that it

is unconstitutional as it has been applied to her because it abridges her right to freedom of speech

and the press.[2]

### III.   Material Facts

Having reviewed the stipulated record, the Court finds the material facts to be as follows.

### A.   Golden Municipal Code

This controversy concerns certain provisions of the City of Golden's (the "City" or

"Golden") municipal code (the "Code") that establish campaign finance and reporting

requirements.  The Code states that the provisions are in place to, in part, combat the potential

for undue influence or the appearance of undue influence which is often associated with large

campaign contributions.  *See* § 1.05.000.  The provision at issue in this case is section

1.05.060(a), as it existed in 2005 when applied to Ms. Olson (the "2005 Ordinance"), which

provides:

> Any person making non-committee expenditures totaling more than $50.00 shall
> deliver notice in writing of such expenditures to the City Clerk not later than three
> business days after the day that such funds are expended or services or materials
> provided. . . .

> In the definition section, 1.05.010, a "non-committee expenditure" is defined as "an

---

[2]  The parties delineated these claims in their Proposed Final Pretrial Order **(#66)**.  The
Court limited the parties to these claims at the Final Pretrial Conference **(#68)**.  Despite this
limitation, Ms. Olson's opening brief also addresses the constitutionality of the attorney fee
provision of Golden's municipal code.  However, because such a challenge was not included in
the Proposed Final Pretrial Order, the Court declines to address it.  *Wilson v. Muckala*, 303 F.3d
1207, 1215 (10th Cir. 2002) (claims, issues, defenses, or theories of damages not included in the
pretrial order are waived even if they appeared in the complaint).

expenditure by any person other than a candidate, political committee, or issue committee that is

not controlled by or coordinated with any candidate or agent of such candidate or candidate's

committee." A "person" is defined as "any individual, partnership, committee, association,

corporation, labor organization or other organization or group of persons." At the time this

action was filed, the term "expenditure" was defined as "the payment, distribution, loan or

advance of any money for goods or services related to the support or opposition of any

candidate, ballot issue, ballot question or issue."

However, effective October 2010, the Code was revised (the "Amended Ordinance") to

include the following definition of "expenditure:"

> Expenditure shall mean the payment, distribution, loan, gift or advance of any money
> for goods or services by any person or organization for the purpose of expressly
> advocating the election or defeat of any candidate, ballot issue, ballot question or
> issue. . . .
>
> > (1) If any portion of goods or services obtained or purchased by a person are
> > used in any manner by any person or organization for the purpose of
> > expressly advocating for the election or defeat of any candidate, ballot issue,
> > ballot question or issue, the pro rata value of such portion of goods or
> > services shall constitute an expenditure.
> >
> > (2) "Expenditure" shall not include any cost incurred in covering or carrying
> > any news story, editorial endorsements, opinion or commentary writings, or
> > letters to the editor by any broadcasting station (including a cable television
> > operator, programmer or producer), newspaper, magazine, or other periodical
> > publication, including any Internet or electronic publication, that is viewable
> > by the general public and is primarily devoted to the dissemination of news
> > and editorials to the general public, and is not owned or controlled by a
> > candidate, candidate's committee, political committee or issue committee.

Under the Code, the City Clerk "shall impose a civil penalty of fifty (50) dollars per day

upon the person responsible for filing reports for each day that a report required to be filed by

this chapter is not filed by the close of business on the day due." *See* § 1.05.090. Additionally,

3

the Code provides that the Campaign Election Board is empowered to hear any complaint brought by a resident of the City or City employee assigned to campaign finance regulation.  *See* § 1.05.120(c).  The Campaign Election Board is required to meet with the alleged violator, and, if necessary, attempt to resolve the matter by written agreement.  If the Board concludes that there has been a violation, but is unable to work out a voluntary agreement, it must request the City Attorney (subject to approval by City Council) to appoint a special prosecutor.  The special prosecutor reviews the matter and, if probable cause exists, may proceed with prosecution in municipal court.  *See* § 1.05.120(d).

### B.    Ms. Olson

Ms. Olson, through her company Bannack Publishing Company, publishes The Voice of Golden ("The Voice").[3]  According to Ms. Olson, The Voice presents views that don't appear in the local newspaper and is designed to "get people to pay attention to what's going on and get involved."  Ms. Olson finances the publication and makes all content decisions.  The Voice is distributed through bulk mail to approximately 7,300 households in the City of Golden free of charge.

The October 2005 issue of The Voice included, *inter alia*, (i) short articles about city council decisions, including background information and commentary; (ii) letters to the editor - one by a candidate for city council, three by candidates for the school board, and a fourth endorsing candidates for the school board election; (iii) a categorization of the city council

---

[3]  It appears that Bannack Publishing Company is simply an alter ego of Ms. Olson under which she publishes The Voice.  With respect to this action, the City pursued enforcement of the 2005 Ordinance against Ms. Olson personally rather than against Bannack Publishing Company.  Accordingly, the Court concludes, from the evidence before it, that Ms. Olson has standing to challenge the law.

candidates as either being "committed to putting citizens first" or who have "demonstrated a willingness to go along with those who have a connection to special interests;" (iv) a commentary on various ballot issues; and (v) a paid advertisement against a ballot issue.

David Ketchum, a city council member at the time, filed a complaint with the City Clerk contending that The Voice included subject matter that required a reporting of costs in accordance with the 2005 Ordinance.  By letter dated November 9, 2005, the City Clerk notified Ms. Olson that a complaint had been filed against her regarding her failure to report expenditures under the 2005 Ordinance.

The following day Ms. Olson submitted an expenditure report in accordance with the 2005 Ordinance for both the October 2005 and the September 2005 issues.  Ms. Olson also sent a letter to the City Manager questioning the validity of the complaint against her.  The City Manager responded by letter stating that the matter was being referred to the Campaign Election Board (the "Board") and that a meeting had been scheduled for November 16, 2005 to address the allegations in the complaint.  Ms. Olson subsequently withdrew her expenditure report, stating that the material in The Voice was properly characterized as an in-kind contribution rather than a non-committee expenditure.  Therefore, Ms. Olson simply reported the value of the contribution to each candidate.

The complaint was forwarded to the Board, which convened a meeting on November 16, 2005.  Ms. Olson did not appear.  The Board continued the meeting to November 21, 2005 and notified Ms. Olson of the new hearing date.  Ms. Olson again failed to appear.  This time, however, the Board proceeded with the hearing and received additional evidence.  A few days later the Board issued their ruling.  It concluded that the October 2005 issue of The Voice

contained information constituting an expenditure, in particular stating that the issue contained "information in support of select city council members and in opposition to the two local ballot issues." Based on Ms. Olson's representation that she charges $50 per page for advertisements, the Board concluded that the portions of the issue that constituted an expenditure were in excess of $50 and, therefore, Ms. Olson was required under the 2005 Ordinance to report the expenditure. The Board recommended that the city attorney appoint a special prosecutor to determine whether to pursue legal proceedings against Ms. Olson.

In March 2006, the special prosecutor filed suit in municipal court against Ms. Olson for violation of the 2005 Ordinance. The suit sought a judgment declaring that Ms. Olson was in violation of the 2005 Ordinance, an order requiring Ms. Olson to abate violation of the 2005 Ordinance, and an award of costs, attorney fees, and interest associated with prosecuting the violation. The case, however, was ultimately dismissed upon agreement between the parties. As part of that agreement, Ms. Olson reported the expenditures for the entire October 2005 issue of The Voice. No further reporting was expressly agreed upon or required. The City withdrew its claim to collect attorney fees and costs associated with the action. No fines were levied against Ms. Olson either under the agreement or by the City Clerk.

After the October 2005 issue, Ms. Olson published issues in February 2006, May 2007, June 2007, July 2007, August 2007, September 2007 (2 separate issues), October 2007 (3 separate issues), November 2007, December 2007, January 2008, February 2008, March 2008, July 2008, September 2008, November/December 2008. Ms. Olson voluntarily reported the expenditures for the entirety of each issue published between August 2007 and November 2007.

## IV.  Standard of Review

Fed. R. Civ. P. 56(c) provides for the entry of summary judgment if the parties'
evidentiary materials "show that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."  Because the parties have stipulated as
to all of the material facts, the Court applies the law to the stipulated facts.

## V.  Analysis

### A.  Constitutional Limitations on Campaign Finance Disclosure Laws

Although recognizing that campaign finance regulation may burden speech and other
First Amendment rights, the Supreme Court has held that states or municipalities may
constitutionally require reporting of expenditures by non-campaign persons or entities on express
advocacy or its functional equivalent.  *See Buckley v. Valeo*, 424 U.S. 1, 14 (1976); *McConnell
v. Fed. Election Comm'n*, 540 U.S. 93, 136–37 (2003); *see also McIntyre v. Ohio Elections
Comm'n*, 514 U.S. 334, 347 (1995) (determining that *Buckley's* reasoning applies to issue
advocacy as well as candidate advocacy).  "Express advocacy" is a term of art that has been used
in Tenth Circuit and United States Supreme Court case law to mean speech that contains express
terms advocating the election or defeat of a candidate (e.g., "vote for," "defeat," "reject," etc.),
or its functional equivalent.  *Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d
1174, 1187 (10th Cir. 2000) (citations omitted).

Such reporting requirements generally must pass strict scrutiny, that is, they must bear a
significant relationship to a substantial government interest.[4]  *Buckley*, 424 U.S. at 80-81.

---

[4]The exact standard of review relevant to campaign finance regulations that burden First
Amendment freedoms is somewhat unclear.  In the context of campaign finance, the Supreme
Court has used multiple phrases to described the standard to apply.  *See Buckley v. Valeo*, 424

However, regulation of express advocacy, including disclosure requirements, can generally be justified by governmental interests in ensuring fair elections and other important policy concerns. *Davidson,* 236 F.3d at 1197 (identifying three compelling governmental interests in requiring disclosure of expenditures: (1) providing the electorate with information as to where political campaign money comes from and how it is spent; (2) deterring actual corruption and the appearance of corruption by exposing large contributions and expenditures "to the light of publicity;" and (3) assisting in gathering data necessary to detect violations) (citations omitted). Campaign finance laws are of course also subject to review under other generally applicable constitutional principles such as vagueness and overbreadth.

### B.      Facial Challenges

In this case, Ms. Olson raises three separate, but related, facial challenges to the 2005 Ordinance: (i) the 2005 Ordinance is unconstitutionally vague; (ii) the 2005 Ordinance is unconstitutionally overbroad; and (iii) the 2005 Ordinance does not survive the "exacting

---

U.S. , 44–45 ( ) (using "exacting scrutiny" in analyzing the constitutionality of the expenditure limitation and explaining that the standard required a "relevant correlation" or "substantial relation" between a "sufficiently important" governmental interest and the burden on First Amendment freedoms); *id.* at 75 (suggesting that strict scrutiny was the proper standard when analyzing disclosure requirements for individual expenditures); *id.* at 25 (using a "closely drawn" standard to determine whether campaign contribution limits are constitutional); *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (hereinafter *"WRTL"*) (applying strict scrutiny, *i.e.*, whether the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest"); *Citizens United v. Fed. Election Comm'n*, 130 S.Ct. 876, 898 (2010) (applying strict scrutiny). Regardless of the exact standard of review, however, it is clear that the standard is more rigorous than intermediate scrutiny and likely approaches, if not equals, strict scrutiny. *See Buckley*, 424 U.S. at 25, 44–45, 75; *McConnell*, 540 U.S. at 136–37; *WRTL*, 551 U.S. at 464; *Citizens United*, 130 S.Ct. at 898.

scrutiny" that it must to burden First Amendment rights.[5]  Ms. Olson's vagueness and

overbreadth arguments concern the phrase "related to the support or opposition of any candidate,

ballot issue, ballot question or issue" as it is used to define "expenditure."  She contends that this

phrase is facially vague because it does not provide sufficient clarity to reasonable persons as to

what actions are covered by the statute and allows arbitrary and discriminatory application.  She

also argues that  the phrase is overbroad because it includes many types of political speech that

cannot be constitutionally regulated, *i.e.*, it regulates speech that is not express advocacy or its

functional equivalent.

Since the time that Ms. Olson brought this action, however, Golden amended the 2005

Ordinance.  Because these amendments changed the very provisions Ms. Olson challenges,

Golden contends that her facial challenges are now moot.  Ms. Olson disagrees, arguing that

because it is not "absolutely clear" that the amendments to the 2005 Ordinance, as reflected in

the Amended Ordinance resolve all of her challenges.  Instead, the gravaman of her challenges

remain in dispute.  Alternatively, Ms. Olson argues that even if her vagueness and overbreadth

challenges have become moot, her general challenge to the entire campaign finance regulation

remains viable.

The existence of a live case or controversy is a constitutional prerequisite to federal court

jurisdiction.  *See Davidson*, 236 F.3d at 1181–82.  Thus, before addressing the merits of a

---

[5]  Ms. Olson argues that the 2005 Ordinance's failure to include an express exemption for the press makes the 2005 Ordinance unconstitutionally overbroad.  The Court, however, understands this argument to be a direct facial attack on the constitutionality of the 2005 Ordinance based on its chilling effect or burdens on First Amendment freedoms.  Indeed, the argument is premised on the burden the 2005 Ordinance places on the freedom of the press, a First Amendment freedom.

dispute, a court must determine whether it has been resolved.  This requirement must be satisfied

at all stages of an action; in other words, it is not enough that there be a live controversy at the

time the litigation is initiated; instead, the controversy must exist at the time the court is called

upon to determine it.  *See City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).  A

controversy is considered moot when the issues presented have been resolved or the parties lack

a legally cognizable interest in the outcome.  *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287

(2000).  The critical question is whether a determination of the issues would have any actual

effect in the real world.  *See Davidson*, 236 F.3d at 1181.  If not, then any determination would

be advisory.  As a consequence, a court then lacks jurisdiction in the matter.  *See City of Erie*,

259 U.S. at 287.

In deciding whether an action has become moot based on the voluntary action or inaction

by the defendant, the question is whether events have "made it absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  The burden of making this

showing lies with the party asserting mootness, here the defendant.

Ordinarily, the repeal of a challenged statute is sufficient to demonstrate that its allegedly

unconstitutional effect would not reasonably be expected to recur.  *See Davidson*, 236 F.3d at

1182.  Indeed, the Tenth Circuit has long since observed  that issuance of a declaratory judgment

as to the constitutionality of repealed statute is the epitome of an advisory opinion.  *See id.*

(citing *Nat'l Adver. Co. v. City & County of Denver*, 912 F.2d 405, 412 (10th Cir. 1990)).

However, when a statute is not repealed, but replaced by a new version, the question is a bit

more nuanced.  In such event,  a court examines  whether the new statute is sufficiently similar

to the repealed statute such that the challenged conduct would continue.  If  the differences between the new statute and old one are either so numerous or so fundamental that the challenged conduct is not likely to continue, resolution of the controversy with regard to the old statute is not warranted.  *See id.*  The approach taken with regard to statutes is equally applicable to ordinances such as those at issue in this case.

Here, the changes to the 2005 Ordinance go to the heart of  Ms. Olson's original facial challenges.  The phrase that Ms. Olson claimed was vague and overbroad has been replaced with more limited application to expenditures to that are "for the purpose of expressly advocating the election or defeat of any candidate, ballot issue, ballot question or issue."  In other words, the Ordinance has been amended to include exactly what Ms. Olson claimed was missing—a limitation of the 2005 Ordinance's reach to express advocacy or its functional equivalent.  This the change to the Ordinance cures Ms. Olson's vagueness and overbreadth challenge.  *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1256 (10th Cir. 2004) (affirming district court dismissal of an action as moot when the challenged statute had been amended to cure the alleged defect).

Ms. Olson also contends that the 2005 Ordinance is facially unconstitutional because it does not provide for an exemption for the press.  She argues that without such exemption, the 2005 Ordinance is not narrowly tailored to the state's interest in generating information and creating transparency in the election process.  The Amended Ordinance, however, includes an explicit exclusion for the press.[6]  Again, the amendment has provided exactly what Ms. Olson

---

[6] As described *supra*, the new definition provides:

(2) "Expenditure" shall not include any cost incurred in covering or carrying any news story, editorial endorsements, opinion or commentary writings, or letters to

challenged—an exemption for the press.

Ms. Olson argues in her supplementary response brief (**#91**) that this challenge has not become moot because the Amended Ordinance's campaign finance regulation continues to burden and chill  First Amendment rights.  She refers back to the Amended Complaint (**#25**) for articulation of this claim.   As observed earlier, however, the claims in this action have been limited by the Final Pretrial Order.  Neither it nor Ms. Olson's briefing identifies or develops such a challenge.  She has focused only on the phrase in the 2005 Ordinance "related to the support or opposition" and its absence of a press exemption.  Ms. Olson also contends that her facial challenge is not moot because activities such as hers might not fall within the press exemption and that the reporting requirements cannot constitutionally be applied to speech such as that expressed in The Voice.  As discussed below in connection with Ms. Olson's as-applied challenge, neither the 2005 nor the Amended Ordinance unconstitutionally burden Ms. Olson's First Amendment rights, regardless of whether she falls within the newly adopted press exemption.[7]

---

the editor by any broadcasting station (including a cable television operator, programmer or producer), newspaper, magazine, or other periodical publication, including any Internet or electronic publication, that is viewable by the general public and is primarily devoted to the dissemination of news and editorials to the general public, and is not owned or controlled by a candidate, candidate's committee, political committee or issue committee.

[7]Ms. Olson also relies on *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) to argue that the reporting requirements are facially overbroad because they require disclosure of expenditures relating to ballot issues, not just candidates.  *Sampson* concerned Colorado state regulation of "issue committees" and involved registration and other disclosure requirements that are far more extensive than those at issue here.  The court in *Sampson* examined the interests supporting the regulation and determined that they were not sufficiently compelling as applied to the plaintiffs given the burden imposed.  In its analysis, the court noted that the several interests applicable to disclosing expenditures on behalf of candidates, such as exposing potential *quid*

In summary, the Court finds that the amendments to the 2005 Ordinance are so fundamental to Ms. Olson's facial challenges, that there is no reasonable expectation that the alleged constitutional infringement will recur.  Thus, such challenges to the 2005 Ordinance have become moot. [8]

### C.      As-Applied Challenge

Ms. Olson also argues that the 2005 Ordinance was unconstitutionally applied to her with

---

*pro quo* arrangements, do not apply with the same force to issue advocacy.  However, given the significant differences between the regulatory schemes at issue and the fact that *Sampson* resolved an as-applied challenge, I do not read *Sampson* as prohibiting any regulation of ballot issue advocacy.  In addition, this is a new argument raised for the first time in a supplementary response brief on the issue of mootness.  Ms. Olson has never sought to amend the Proposed Final Pretrial Order or trial brief to make this argument or assert this as a basis for her overbreadth challenge.

[8] Ordinarily, at this juncture, a court would consider whether exceptions to the mootness doctrine would apply.  Exceptions apply when: (i) secondary or collateral injuries survive after resolution of the primary injury; (ii) the issue is deemed a wrong capable of repetition yet evading review; (iii) the defendant voluntary ceases an allegedly illegal practice but is free to resume it at any time; and (iv) a property certified class action suit.  *See Riley v. INS*, 310 F.3d 1253, 1257 (10th Cir. 2002).  However, neither party has suggested that any exception is applicable.

On independent review , the Court finds no exception to the mootness doctrine to be applicable.  The first and fourth exceptions do not apply because Ms. Olson has not articulated any secondary or collateral injuries and this is not a class action.  The third exception, voluntary cessation with opportunity to resume, is not applicable because Golden cannot resume enforcement of the 2005 Ordinance now that it has been amended.

The second exception, a wrong capable of repetition yet evading review, is inapplicable where the challenged law has been amended.  *See Utah Animal Rights Coalition*, 371 F.3d at 1257. Ms. Olson makes a conclusory statement in her supplement that the unconstitutional infirmities in the 2005 Ordinance are capable of repetition yet evading review, but her point appears to be that it would be more efficient to decide the controversy now rather than to see if she is subject to future enforcement under the Amended Ordinance.  This concern speaks to application of the Amended Ordinance to Ms. Olson,  which is wholly different from her current facial challenges and is speculative at this point.

respect to the October 2005 issue of The Voice.[9]

        1.    <u>Express Advocacy</u>

A threshold issue is whether the October 2005 issue contained the type of speech that may be regulated consistent with the First Amendment.  Ms. Olson agrees that all that may be constitutionally regulated under *Buckley* is express advocacy or its functional equivalent.[10]  She contends that the 2005 Ordinance was unconstitutionally applied to her because the October 2005 issue of the Voice did not include express advocacy or its functional equivalent.

As explained in *Buckley*, express campaign advocacy is communication that advocates for the election or defeat of a candidate (or issue) using magic language such as  "vote for", "elect", defeat," etc.  *See Buckley*, 424 U.S. at 44.  Express advocacy is easy to spot as it is "express" and utilizes language clearly stating its purpose. However, because advocacy may occur without including such  "magic words",  the "functional equivalent" of express campaign advocacy can be similarly regulated.

The functional equivalent of express campaign advocacy, however, is more difficult to identify.   In grappling with whether an advertisement contained the functional equivalent of express advocacy, the Supreme Court provided some guidance - an advertisement is the

---

[9] Although Ms. Olson voluntarily reported the cost of the issues of The Voice from August 2007 to November 2007, she brings an as-applied challenge only with respect to the October 2005 issue.  This is indeed the only issue for which any enforcement action was ever taken against Ms. Olson and the only issue for which there is any indication that the City believes is subject to the campaign finance regulation.

[10] There is some suggestion in Ms. Olson's briefing that she also contends that the 2005 Ordinance was unconstitutionally applied to her because the October 2005 issue was not comprised solely of express advocacy or its functional equivalent.  However, there is nothing in the record indicating that Golden's enforcement of the 2005 Ordinance was based on its determination that the entirety was subject to the 2005 Ordinance.

functional equivalent of express advocacy "only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."[11] *See WRTL*, 551 U.S. at 469–70.

---

[11] The Court notes that the Fourth Circuit has interpreted *WRTL* to require satisfaction of a two-part test in order for a communication to be the functional equivalent of express campaign advocacy : (i) it must fall within the definition of an electioneering communication under the Bipartisan Campaign Reform Act of 2002 ( for example be a broadcast, cable or satellite communication referring to a clearly identified candidate made within 60 days of a specified election) ; and (ii) it must be susceptible to no reasonable interpretation other than as an appeal to vote for or against a specific candidate. *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 282 (4th Cir. 2008). It appears that this interpretation of *WRTL* comes from a footnote in the majority opinion addressing the dissent's position that the test was too indefinite and vague. The majority explained the ways in which the test was aimed at a precise result and stated "[a]nd keep in mind this test is only triggered if the speech meets the brightline requirements" of being an electioneering communication in the first place.

In the context of *WRTL* the reference to the definition of an electioneering communication under BCRA is obvious because BCRA was the regulation at issue. But this Court does not read *WRTL* as limiting the scope of functionally equivalent speech for constitutional analysis to require that the communication fall within the definition of an electioneering communication as defined by BCRA - in essence, a broadcast, cable or satellite communication referring to a clearly identified candidate within 60 days of a specified election. To do so would conflate the constitutional analysis of *WRTL* with the terms of statute it considered, and preclude a wide variety of communications through different media from falling within the scope of the functional equivalent of express advocacy.

Although courts should be cautious in considering regulation of functionally equivalent expressive speech, the purpose of the caution is not a function of the media used for the communication, but instead to the impact that regulation has upon First Amendment expression. The rationale for permitting regulation of functional equivalent expression - that of providing transparency and providing information pertinent to the election process - is as applicable to print or internet advertisements as to radio and video broadcasts. Indeed, in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136–37 (2003), the Supreme Court recognized that the BCRA definition of "electioneering communication" was underinclusive because it did not include print media or internet communications. Although the Court did not address whether regulation of communications not expressly covered by BCRA would be constitutionally permissible (as the issue was not before the Court), its recognition that the statutory definition of "electioneering communications" was underinclusive implies that functional equivalent expression may occur through other media or in other venues. Unlike the 4th Circuit, this Court reads *WRTL* as focusing on BCRA and not as a limiting functionally equivalent expressive speech to that defined as an electioneering communication by BCRA.

15

The October 2005 issue of The Voice includes two instances of express advocacy.  On page 10 (Record 1258) is the Guest Editorial by Don Parker.  Its last sentence reads "To help Keep Golden Golden, please vote No on Question 201."  In addition, Page 11 (Record 1259) states "Vote NO on Question 201," "Vote NO on 201 The Subsidy Issue," and "When you receive your ballot, please open it up and vote NO on the 'limited exception' Question 201."  Ms. Olson claimed this page was paid advertisement that constituted an in-kind contribution.  Both of these pages include the magic language of express advocacy, *i.e.*, "vote," and, therefore, subject the issue to the disclosure requirements.[12]

The October 2005 issue also includes the functional equivalent of express advocacy.  Page 5 (Record 1253) has two large headings, one entitled "How do you decide who to vote for?" and the other "How do you decide how to vote on 200 and 201?"  Under the first heading, the publication lists the candidates for city council who "put citizens first" as opposed to those who have demonstrated a willingness to go along with special interests.  The bottom portion of the page addresses two ballot measures, stating that the measures are worded to "fool the voters," would repeal an amendment adopted by the citizens a few years ago, and are examples of the special interests influence on the city council.  Although the page states that the decision of how and for whom to vote is up to the reader, the article is clearly designed to advocate for the election of the candidates who put citizens first and the defeat of the ballot measures that are

---

[12]  The Court is aware that the fact that some of the use of the magic language was through a paid advertisement could arguably raise some issues as to whether the printing of that page was really an expenditure to Ms. Olson, *i.e.*, did she pay, distribute, loan or advance any money in support of this express advocacy.  The Court, however, need not address such issues as there are other portions of the October 2005 issue that constitute express advocacy or its functional equivalent.

backed by special interests.  For example, as to the candidates, the page states, "[i]f you want the special interests to continue to control Golden, that is the way to vote" but "[i]f you believe it is time for a change and the city council should represent you and put citizens' interests first, that is the way to vote."  The options are presented as so starkly desirable or undesirable that the page is not subject to any reasonable interpretation other than advocacy for the specified candidates. This page, therefore, constitutes the functional equivalent of express advocacy under *WRTL*. Because the October 2005 issue contained speech that could be constitutionally regulated, Ms Olson's challenge on these grounds fail.

## 2. Press Exemption

Having determined that the October 2005 issue of The Voice contained the type of speech that can be subjected to regulation, the question arises whether application of the 2005 Ordinance was nonetheless unconstitutional because it contained no express exemption for media or press activities.

As noted above, the general framework for determining whether a campaign finance law unconstitutionally burdens speech is set forth in *Buckley* and its progeny.  With regard to this question Golden has the burden to demonstrate by a preponderance of the evidence that its 2005 Ordinance survives strict or exacting scrutiny, *i.e.*, that it is substantially related to a compelling interest and is narrowly tailored to that interest.  *WTRL*, 551 U.S. at 464; *Association of Community Organizations for Reform Now, (ACORN), v. Municipality of Golden*, 744 F.2d 739, 746 (10th Cir. 1984) (although duly enacted laws are generally presumed constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality).

For the purposes of this analysis, the Court considers the provisions of the 2005 Ordinance (before the amendments). There is no question that complying with disclosure and registration requirements imposes a burden on core political speech. *Buckley*, 424 U.S. at 39. Golden maintains that infringement by requiring reporting of expenditures for the October 2005 issue of The Voice was nonetheless justified, and survives constitutional scrutiny, because the 2005 Ordinance serves the purposes identified in *Buckley* of providing information about where political campaign money comes from, deterring corruption, and gathering data to assist in enforcement. According to the evidence presented, the disclosure requirements of the 2005 Ordinance that are at issue were enacted for the purposes of preventing corruption in local elections, keeping voters informed as to the sources of political contributions, and preventing wealth concentrations from swaying local elections. Golden argues that the disclosure requirements were the least restrictive means of achieving that purpose.

These arguments are in line with existing case law, which generally holds that disclosure of expenditures on express advocacy or its functional equivalent, both with respect to candidates and issues, can be constitutionally required because such requirements survive exacting (or strict) scrutiny. *See Buckley*, 424 U.S. at 77–78; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136–37 (2003); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("The principles enunciated in *Buckley* extend equally to issue-based elections. . . ."); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1103 n.18, 1104 (9th Cir. 2003) ("[W]e think there can be no doubt that states may regulate express ballot-measure advocacy through disclosure laws."); *Nat'l Right to Work Legal Defense and Educ. Found., Inc. v. Herbert*, 581 F.Supp.2d 1145 (D.

18

Utah 2008).[13]  Indeed, such regulations pass exacting or strict scrutiny as they bear a significant

relationship to a substantial government interest, *i.e.*, to generate information and transparency in

the election process.  *See Buckley*, 424 U.S. at 14; *McConnell Fed. Election Comm'n*, 540 U.S.

93, 136–37 (2003); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

They have also been held to be the least restrictive means of achieving those ends.  *See Buckley*,

424 U.S. at 68.

Given the legal authority discussed above, the Court finds that Golden has carried its

burden in showing that the disclosure requirements of the 2005 Ordinance served a compelling

purpose in providing information to the public about the source of non-campaign funds expended

on behalf of a candidate or issue and deterring corruption or the appearance of corruption.  In

addition, Golden has shown that the 2005 Ordinance was narrowly tailored to that purpose.  The

disclosure requirements were not onerous, involving only the reporting of expenditures over $50.

The report required identifying and contact information about the person making such

expenditure, the candidate or issue that the expenditures were intended to support or oppose,

information about the vendors and a description of the expenditure, and the date and amount of

---

[13]  The Supreme Court's decision in *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 296–97 (1981), does not compel a conclusion that express advocacy as to issues, as opposed to candidates, may not be constitutionally regulated.  In *Berkeley*, the Court noted that *Buckley's* analysis of the governmental interest justifying contribution limits, *i.e.*, the avoidance of *quid pro quo* arrangements or the perception thereof, applied only to contributions to candidates and not contributions to committees formed to favor or oppose ballot measures.  *Berkeley* did not address regulations of ballot measures or initiatives in the form of disclosure requirements.  The governmental interest justifying disclosure requirements is not to avoid *quid pro quo* arrangements, but merely to provide information as to expenditures that are unambiguously campaign related.  Accordingly, *Berkeley's* analysis of the application of *Buckley* does not foreclose the application of *Buckley* to the disclosure of expenditures for the passage or defeat of ballot measures.

the expenditure.  This provided the information the public would need to understand who spent money on behalf of a candidate or issue, how much, how, and what the effect of that expenditure might be.

Plaintiff does not dispute the fundamental purposes for which the 2005 Ordinance was enacted; rather, she contends that those interests are inapplicable to her activities or are trumped by the interests and value of a free press in the political process.  The Court understands Ms. Olson's argument to be that such legitimate interests are less compelling or the 2005 Ordinance more burdensome when it was applied to her because she published a newsletter, which should have entitled her to a  "press" exemption.[14]  Ms. Olson does not appear to dispute that to the extent an individual prints and distributes materials expressly advocating the election of a particular candidate, there is a justified interest in the public disclosure of the individual's identity and how much he or she spent in helping the candidate get elected.  However, Ms. Olson characterizes herself as the "press", and she contends that her activities are therefore entitled to a heightened level of protection.

There is no doubt that the press has a unique and important role in American society, especially in politics.  *See, e.g., Austin v. Mich. State Chamber of Commerce*, 494 U.S. 652, 667

---

[14]Ms. Olson alternatively characterizes her activities as "independent, individual" political action, which she contends does not create concern about the effect of significant and sizable contributions upon a campaign.  Response Brief (#73) at 17.  This argument misses the point; the purpose of the statute is to identify sources of expenditures, large or small, on behalf of a candidate or issue in order to provide the electorate with information about the effect of money in the election.  Unless such amounts are disclosed, the public cannot know whether the amounts are insignificant or have the potential to influence the outcome of the election.

(1990), *overruled in part by Citizens United*, 130 S.Ct. 876 (2010).[15]   However, Ms. Olson has

presented no case law, and the Court has found none, holding that the First Amendment requires

that the press must be excluded from campaign funding disclosure requirements.[16]  Her

argument invites the Court to make a sweeping determination that the Constitution requires a

press exemption from all campaign finance disclosure laws followed by a finding that Ms.

Olson's particular activities qualify for such an exemption.

     The Court declines to make these determinations because neither are necessary to

resolution of her claims.   In *Federal Election Commission v. Massachusetts Citizens for Life,*

*Inc.*, 479 U.S. 238 (1986), the United States Supreme Court made clear that even when a press

exemption exists, such as in the Federal Election Campaign Act ("FECA"), the First Amendment

analysis of *Buckley* remains dispositive.  *Massachusetts Citizens for Life* concerned the

---

     [15]In *Austin*, the Supreme Court determined that the Bipartisan Campaign Reform Act of 2002's exclusion of media corporations from an expenditure restriction did not violate the equal protection clause because the differentiation was supported by a compelling state interest—the press's unique societal role in informing and educating the public.  *Austin* did not conclude that media entities were immune from campaign disclosure requirements.  Nor did it address whether the governmental interest in requiring expenditure disclosures was applicable to the press.  In fact, *Austin* noted that the press is not necessarily entitled to any additional protection under the First Amendment than an ordinary citizen.  *See id.* at 668 (citing to *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 782 (1978)).  Thus, *Austin's* determination that a law restricting campaign expenditures could constitutionally differentiate based on status as the "press," does not lead to the conclusion that the Constitution requires the press be exempted from campaign finance reporting requirements.

     [16]The most likely reason for the dearth of caselaw regarding whether the "media" or "press" should be subject to reporting or disclosure requirements for any activities involving express advocacy is that federal campaign law contains such an exemption, which the Amended Ordinance in Golden tracks, as do many similar regulatory schemes modeled on the federal statute.  *See* 2 U.S.C.A. §§ 431(9)(B)(i) (excluding from the definition of "expenditure" the following: "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate").

application of several provisions of the FECA to a publication that urged readers to vote "pro-life" in an upcoming election.  The opinion addressed several separate issues, including whether the publication at issue (a one-time "Special Edition" voter guide) was an expenditure subject to the FECA and, as a separate matter, whether it fell within the FECA's exemption for news media.  The Court held that although the appellant's regular newsletter might fall within FECA's the press/media exemption, the "Special Edition" did not, given the circumstances of its creation and distribution.  After determining that the appellant's "Special Edition" was subject to regulation under FECA, the opinion went on to examine whether, as a constitutional matter, FECA could be applied to the appellant, *i.e.*, whether the government's interest in regulating the appellant's political speech was sufficiently compelling and narrowly tailored to justify the significant burden on the appellant's activities.

*Massachusetts Citizens for Life* establishes that *Buckley* remains the touchstone when addressing regulations that affect campaign- or election-related speech in publications, regardless of whether a press exemption applies.  In the absence of a press exemption like that in the FECA, a court simply applies the regulation to the publisher of a specific publication.   This requires the same analysis as used in *Massachusetts Citizens for Life* for the publication that fell outside the press exemption and therefore was subject to the FECA regulation.  Therefore, the issue here is whether, under *Buckley*, the application of the 2005 Ordinance to the October 2005 issue of The Voice unduly burdened Ms. Olson's speech.  Whether Ms. Olson to characterizes herself as "the independent press" is irrelevant.  Press or not, she must show that, as applied to her in the context of October 2005 issue of The Voice, the 2005 Ordinance does not satisfy the *Buckley* test.

22

Viewing the application of the 2005 Ordinance to the October 2005 issue of The Voice through the *Buckley* lens, Golden has come forward with a compelling justification for the regulation.  Ms. Olson is obligated to show either that 1) Golden's interest in and means of regulating disclosure differs with regard to publication of The Voice than it would to her as a private citizen expressing her own views, or 2) that her ability to comment and editorialize on political candidates and ballot issues in The Voice has been impaired by enforcement of the regulation. The general contention that campaign regulation might affect the ability of the press, as a general and abstract matter, "to comment and editorialize on political candidates and ballot issues" (Resp. Br., #73, at 27), is not sufficient.[17]  Therefore, this challenge to the law as applied to her also fails.

**IT IS THEREFORE ORDERED** that judgment shall enter in favor of Defendant City of Golden, Colorado and against Plaintiff Olson on all of Ms. Olson's claims.

Dated this 1st day of September, 2011.

BY THE COURT:

_____

_____

[17]Ms. Olson relies heavily on language from the legislative history of the FECA concerning the press exemption to argue that press/media entities cannot be regulated at all.  The statement she quotes is from the House of Representatives Report, which clarifies that in enacting the FECA Congress did not intend to limit or burden "the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns."  H.R. Rep. No. 93-1239, p. 4 (1974).  This phrase does not create a constitutional standard prohibiting any and all regulation of news or media entities and, indeed, Supreme Court case law indicates otherwise.  *Cohen v. Cowles Media Co.,* 501 U.S. 663, 668 (1991) ("generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news").

Marcia S. Krieger
United States District Judge